# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

Francine Yates,                              )
                                             )
    Plaintiff,                           )
                                             )
v.                                           )
                                             )
Dr. Kumar Moolyail                           )
Walgreens                                    )
The Illinois Department of Human Rights )
The Chicago Transit Authority               )
The City of Chicago,                         )
                                             )
    Defendants.                          )
                                             )

**08CV4351**
**JUDGE COAR**
**MAGISTRATE JUDGE NOLAN**

Complaint for Plaintiff -- Francine Yates

MAGISTRATE JUDGE NOLAN

Francine Yates
14114 S. Edbrooke Avenue
Chicago, IL  60827
(312) 351-5635
Pro Se

JUDGE COAR

RECEIVED
Jul 31 2008
JUL 3 1 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT



## POINTS AND AUTHORITIES

*775 ILCS 5/6-101* ............................................................................*2*

*720 ILCS 5/31-4* ............................................................................*2*

*68 Ill. Admin. Code §1285.240(c) (2001).* ............................................*3*

*225 ILCS 60/22* ............................................................................*17*

*735 ILCS 5/2 1706.5* ......................................................................*19*

*28 C.F.R.§ 35.130(d)* .....................................................................*20*

*42 U.S.C. § 12111–12117* ...............................................................*22*

*29 U.S.C. Section 794* .....................................................................*22*

*29 U.S.C. Section 706(8)(B)* .............................................................*22*

*34 CFR 104.3(j)(20)(i)* ....................................................................*23*

*45 CFR 84.3(j)(2)(i)* ........................................................................*23*

*405 ILCS 5/2-100(a), 775 ILCS 5/1-102* ..............................................*24*

*18 U.S.C. 1621, 28 U.S.C. 1746* .......................................................*29*

*28 C.F.R.§ 35.130(d)* .....................................................................*32*

## CASE LAW

*Jennings v. Southwood, 446 Mich. 125, 521 N.W.2d 230 (1994),* .................*1*

*Happel v. Wal-Mart Stores, Inc., No. 90482 (Ill. March 21, 2002)* ...............*13*

*Francine Yates v. The Illinois Department of Human Rights, The Chief Legal Counsel, The Chicago Transit Authority  06-3107.* ..........................................*15*

*Richard Goldberg, M.D.   v. The Department of Professional Regulation, Nikki Zollar, Patricia L. Daniels and The Medical Disciplinary Board 1-99-3099* ...............*17*

*Olmstead v. L.C. (98-536) 527 U.S. 581 (1999) 138 F.3d 893.* ...................*21*

*New York Times Co. v. Sullivan, 376 U.S. 254 (1964).* .............................*28*

*Cruzan v. Missouri Department of Health, 497 U.S. 261, 278 (1990).* ...........*31*

## I. NATURE OF CASE

This entire ordeal found its inception in the fact that the plaintiff; Francine Y., would not willfully submit to the sexual advances thrust upon her by her manager; Ernest Payne, who was a deacon in Barack Obama's church. Ernest Payne directed repeated sexual advances toward the plaintiff and she continually ignored him. Because the retaliation and workplace oppression became increasingly severe and hostile, the plaintiff did what any normal, reasonable person would have done in order to escape the persecution she was being subjected to. She engaged in the protected activities of complaining to the Chicago Transit Authority, the Illinois Department of Human Rights and the Circuit Court of Appeals. Because the plaintiff rejected her manager's sexual advances, opposed unlawful discrimination and had prior knowledge of fraudulent business practices within the Chicago Transit Authority; Francine Y., was conspired against by CTA's senior management as well as by Dr. Kumar Moolayil. This was done in an effort to remove her from the Chicago Transit Authority's workplace and eventually from society as well.

Dr. Kumar Moolayil's involvement in this case originated from the fact that he was coerced through willful indifference, conscious indifference and wantonness on behalf of Mayor Richard Daley and his entourage. In *Jennings v. Southwood, 446 Mich. 125, 521 N.W.2d 230 (1994),* the Supreme Court was asked to interpret the term "willful misconduct" contained in the Emergency Medical Services Authority. The Court noted in passing that it is unfortunate that the judiciary and the Legislature have used the phrase "willful and wanton misconduct," as opposed to "willful or wanton misconduct" but concluded that the phrases "willful misconduct" and "willful and wanton misconduct" possess distinct meanings. The term "willful" requires a finding of actual intent to harm, the Court concluded, while the term "wanton" is an intent inferred from reckless conduct. Throughout this entire ordeal, Mayor Richard Daley's intent was to actually

1

inflict harm on the plaintiff. His intent was wanton because the plaintiff sustained many damages and suffered great harm at the hands of Mayor Richard Daley and his entourage.

Mayor Richard Daley and his entourage have consistently throughout time been personified as being "THE MAFIA." Because many individuals have perceived them as such, they have been coerced into breaking laws, aiding, abetting and obstructing justice. While many have been paid, bribed and threatened, others have surrendered their unannounced, active, and willful participation. A lot of people have cringed at the thought and sound of Mayor Richard Daley's name. Some even hide from his presence. However, this innate perpetual fear that resides in the minds and hearts of these individuals is in and of itself a "false fear." *775 ILCS 5/6-101 Part (B) Aiding and Abetting; Coercion.* It is illegal to aid, abet, compel or coerce a person to commit any violation of the Human Rights Act. *720 ILCS 5/31-4 Obstructing Justice.* A person obstructs justice when, with intent to prevent the apprehension or obstruct the prosecution or defense of any person, he knowingly commits any of the following acts: (a) Destroys, alters, conceals or disguises physical evidence, plants false evidence, furnishes false information.

The Chicago Transit Authority was not sure how much information the plaintiff had against the company relating to fraud or how much she could prove, so they became more aggressive and conspired by fraudulently diagnosing her with psychotic illnesses and used them as the sole basis for her wrongful discharge. The harassment, retaliation and coercion escalated after the plaintiff filed a charge of workplace discrimination. It continued over the years and manifested itself within a variety of forms. To free herself from her harassers; the plaintiff; placed a call to the Federal Bureau of Investigations on June 13, 2008 under the direction of Patrick Fitzgerald's office. As a result, this case has become a high profile Federal case.

2

## II. ARGUMENT AND DISCUSSION

### *Charge A: Gross Negligence & Psychiatric Malpractice/Basis: Fraudulent Diagnosis*

Medical malpractice is an act or omission by a health care provider which deviates from accepted standards of practice in the medical community and which causes injury to the patient. It is also an act of professional negligence performed by a healthcare provider that causes injury to the patient. The statute of limitations for medical malpractice in the state of Illinois is two years from the date of the act. However, the state of Illinois is a first discovered state. This means that the plaintiff has two years from the date that they discovered the incident as being erroneous. Gross negligence as defined by the Illinois Board of Professional Regulation is an act or omission which is evidence of recklessness or carelessness toward or a disregard for the safety or well-being of the patient, and which results in injury to the patient. *68 Ill. Admin. Code §1285.240(c) (2001).* The physicians which treated the plaintiff violated ethical standards of the psychiatric medical profession, breached their fiduciary responsibilities to the patient and caused physical and mental harm to the plaintiff who was a member of the public. The Act allows such discipline where the physician engaged in "dishonorable, unethical or unprofessional conduct of a character likely to deceive, defraud or harm the public."

Francine Yates; (Francine Y.), was a patient of Dr. Kumar Moolayil for about six months. She was treated and diagnosed in December 2003 with major depression and anxiety. The plaintiff was also diagnosed with high blood pressure in 2003 by her primary healthcare physician. Another important factor is that the plaintiff was overweight because her body mass index was much higher than its normal index. The plaintiff was overweight by more than twenty-five pounds which most primary health care professionals define as obesity. Obesity is a disease in which excess body fat has accumulated to such an extent that health may be negatively affected.

3

It is commonly defined as a body mass index (weight divided by height squared) of 30 kg/m$^2$ or higher.  Francine Y. disclosed this information as well as the fact that she was taking the prescription drugs of hydrochlorothiazide and potassium to control her high blood pressure. However, in May of 2004, the plaintiff was diagnosed with paranoia by Dr. Kumar Moolayil but she was not aware at that time that Dr. Moolayil committed the act of psychiatric malpractice through gross negligence until she discovered a fraudulent document that was placed within her employment file by Paul Fish.  Francine Y. first discovered that an incident of psychiatric malpractice had occurred in October of 2007 while advocating for herself during the process of retrieving documents from her lawsuit file which was at the Illinois Department of Human Rights.  Because the discovery was made less than a year a year ago and the fact that the plaintiff was mentally incompetent at the time she made the discovery, the statue of limitations in Illinois have been tolled relating to this case.  This means that they have been granted a stay from their expiration until the plaintiff recovers from her illnesses.  The plaintiff; Francine Y., was not mentally competent because she was suffering from severe depression and anxiety at the time she made the discovery.  Because the plaintiff has experienced constant harassment from Mayor Richard Daley and his entourage, the plaintiff's depression and anxiety have become increasingly severe.

Francine Y. became Dr. Moolayil's patient because Paul Fish; Vice President, of the Capital Investment Department of the Chicago Transit Authority gave the plaintiff a memorandum to seek professional help in November of 2003.  The plaintiff used the medical insurance that was provided to her through CTA's medical insurance plan.  The psychiatrist was chosen at random from a list of psychiatric healthcare providers located near the plaintiff's home.  Dr. Kumar Moolayil is a psychiatric healthcare provider.  He diagnosed and treated the plaintiff for anxiety

4

and major depression from the period of December 2003 through May 2004. Throughout this six month process, Dr. Moolayil kept increasing the plaintiff's medication for no apparent reasons. He never provided any substantiated objective medical evidence for the increase in dosages. Eventually, a few weeks prior to the plaintiff's return to work, Dr. Moolayil fraudulently diagnosed the plaintiff with the psychotic mental illness of paranoia. The plaintiff complained to the doctor about the diagnosis. She stated that he made the diagnosis without citing the objective medical evidence to support his prognosis. After Dr. Moolayil engaged in the malicious act of gross negligence, he quickly wrote in his notes that the plaintiff was speaking to fast as being the objective medical evidence for his diagnosis. The plaintiff also asked Dr. Moolayil why he did not send her to see another psychiatrist for a second opinion. Francine Y. was ignored by Dr. Moolayil. He never intended to send her to see another psychiatrist, instead he intentionally breached his fiduciary responsibility and standard duty of care. The plaintiff, Francine Y., has never been afflicted with the psychotic mental illness of paranoia.

In October of 2007, while advocating for herself, the plaintiff discovered a memorandum that Paul Fish had placed in the plaintiff's employment file. The memorandum was dated November 14, 2003. This is when the conspiracy began.    The memorandum that was placed in the plaintiff's file was addressed to "File." This was done in an effort to conceal the real person's name to whom the memorandum was in fact addressed to. The memorandum stated that the plaintiff was exhibiting a growing degree of the mental illness known as paranoia. It also stated that her appearance had become unkempt, making it appear that she was wearing soiled clothing from using the bathroom on herself. Mr. Fish also stated that the employees in the Capital Investment area of the Chicago Transit Authority had become afraid of the plaintiff. Paul Fish is not a doctor. He never sat the plaintiff down and counseled with her about any of the things

5

that were mentioned in the memorandum. The plaintiff was unaware that the memorandum was placed within her employment file on or around November 14, 2003. This was more than Paul Fish's erroneous perception of Francine Y. as being afflicted with a psychotic mental illness. His intention was to conspire against the plaintiff in an effort to remove her from service with the Chicago Transit Authority and eventually segregate her in society by having her committed into a mental institution. Paul Fish engaged in this act of gross negligence and malpractice because of his knowledge of federal and state funds which were being embezzled from capital dollars used to fund CTA's, PACE and METRA capital projects. He was protecting his own selfish interests. Prior to becoming an employee with the CTA, Paul Fish worked for the RTA. The RTA is a board which governs how capital dollars are to be spent among CTA, METRA and PACE. Another reason for the conspiracy is the fact that prior to becoming an employee with the Chicago Transit Authority, the plaintiff worked for the Harris Trust and Savings Bank as part of their benefit payment administration team. She worked directly on CTA's pension plan and had knowledge of funds which had been embezzled from the plan. The doctrine of *res ipsa loquitor* applies to this case because "the thing speaks for itself."

On November 25, 2003, Paul Fish gave the plaintiff a directive which removed her from service with the Chicago Transit Authority and simultaneously required her to seek professional help. Paul Fish is not a doctor, nor did he send the plaintiff to see a psychiatrist within the CTA who could have examined and properly diagnosed her. Paul Fish conspired with Dr. Moolayil to fraudulently keep the plaintiff on medical leave for a period of six months. This is evident because the plaintiff was released by her doctor to return to work on April 27, 2004. When the plaintiff returned to work with her doctor's return to work release form, bearing no work restrictions or limitations, the plaintiff was harassed back off of CTA's premises. This caused

6

the plaintiff to relapse. Francine Y. went to see Dr. Moolayil and reported the workplace incident as well as the fact that she relapsed. Between April 27, 2004 and May 27, 2004, Dr. Moolayil breached his standard duty of care through gross negligence. The prima facie evidence is the fact that he engaged in the act of defrauding the plaintiff by willfully conspiring against her and diagnosing her with a mental illness that she does not have, nor has she ever been afflicted with. Dr. Moolayil also described an extremely dangerous drug for the plaintiff which caused her extreme mental and emotional harm.

A principle difference between working in an occupation and practicing a profession is the fiduciary responsibility that comes with that profession. A fiduciary is a person or group of people who stand in a position of trust. That trust represents a significant obligation to care for the interests of others. Inherent in practicing as a physician, is the fiduciary responsibility that an authoritative person or group of persons in charge accept, placing the interests of others above themselves. An agent is a person or group of persons who perform an act for another. Inherent in this act is fiduciary responsibility and dual agency, which can also be referred to as mixed agency. This is a situation where a person/authoritative figure performs or acts for two others. The two people involved are the client and the entity the agents are employed with. Dr. Kumar Moolayil failed as an agent acting on behalf of the plaintiff. He did not fulfill his fiduciary responsibilities to the plaintiff. Dr. Kumar Moolayil owed the plaintiff the fiduciary duty and responsibility of giving her an accurate, ethical and objective professional medical evaluation. This duty was breached when Dr. Moolayil failed to conform to the relevant standard duty of care through engaging in fraud by aiding, abetting and obstructing justice. Dr. Moolayil diagnosed the plaintiff with a psychotic mental illness that she did not have which was used to

7

separate her from employment and eventually segregate her in society by having her committed into a mental institution.

He failed to conform to this standard of care because he kept increasing the plaintiff's dosages and strength of her anxiety and depression medications without any substantiated, objective medical evidence or a legal medical reason for doing so. Over a very short period of six months, Dr. Moolayil vehemently transitioned the plaintiff from the mental illnesses of major depression and anxiety to the psychotic illness of paranoia. Dr. Moolayil did not exercise discretion as a reasonable psychiatrist would have done based upon the all of the facts that the plaintiff disclosed to him while she was receiving treatment under his care. Because the plaintiff's mental illnesses were sustained from the harassment and retaliation associated with an employment discrimination lawsuit, Dr. Kumar Moolayil did not exercise enough prudence which would have been required for making an accurate, objective medical evaluation for the plaintiff while she was under his care. The defendant breached the standard of care because he deviated from the course of action that a reasonable person would have taken in an effort to correctly diagnose the plaintiff. He did not follow established psychiatric guidelines which disclosed the required scientific evidence needed to make the diagnosis. Secondly, Dr. Moolayil did not request the assistance and collaboration between medical and psychological professionals involved in the treatment and care of the condition known as paranoia. Lastly, Dr. Kumar Moolayil did not proceed with caution as a prudent phsycian; instead, he vehemently transitioned the plaintiff over to a psychotic mental illness known as paranoia. Although he treated the plaintiff, Francine Y., for a period of six months, the diagnosis of paranoia was made within a few weeks upon the plaintiff's return to work.

8

The diagnosis was imprudent and impetuous, meaning it was made out of ignorance and with haste. This was an act of malpractice and an obvious error performed by doctor Kumar Moolayil because he never sent the plaintiff; Francine Y., to another psychiatrist for a second opinion. Also, Dr. Kumar Moolayil never provided the plaintiff with the psychiatric objective medical evidence as proof that she was in fact afflicted with paranoia. He diagnosed her with the mental illness in May of 2004 prior to her return to work on May 27, 2004. When the plaintiff questioned his integrity, Dr. Moolayil defrauded the plaintiff by adding erroneous symptoms to the plaintiff's medical file. Francine Y. asked Dr. Moolayil why he believed she was inflicted with this psychotic illness and why he did not send her to another psychiatrist to receive a second opinion. Dr. Moolayil was dumbfounded. He did not respond. This was done to cover up the malpractice and the fraudulent diagnosis. He told the plaintiff that the objective medical evidence was the fact that she was talking too fast. He quickly added the fraudulent notes into the plaintiff's medical file. Dr. Moolayil also gave the plaintiff a prescription for a dangerous psychotic drug called Abilify. Abilify is drug which is primarily used to treat bipolar disease and schizophrenia. It was approved by the Food and Drug Administration (FDA) on November 15, 2002. Francine Y. does not have any of these mental illnesses nor has she ever been diagnosed with them. It is only the sixth atypical antipsychotic medication of its kind. The drug had been on the market for about one and a half years when it was prescribed for the patient and not enough had been discovered about the drug's potential long term side affects. However some common side affects are Akathisia, headache, unusual tiredness, unusual weakness, nausea, vomiting, an uncomfortable feeling in the stomach, constipation, weight gain, light-headedness, trouble sleeping, restlessness, sleepiness, shaking, and blurred vision. Some of the drugs uncommon side affects include uncontrollable twitching or jerking movements, tremors and

9

seizures. Some people may feel dizzy, especially when getting up from a lying or sitting position, or may experience a fast heart rate. The drug also has rare side affects which are: combination of fever, muscle stiffness, faster breathing, sweating, reduced consciousness, and *sudden change in blood pressure and* heart rate (neuroleptic malignant syndrome). The drug's very rare side effects include: allergic reaction (such as swelling in the mouth or throat, itching, rash), increased production of saliva, speech disorder, nervousness, agitation, fainting, reports of abnormal liver test values, inflammation of the pancreas, muscle pain, weakness, stiffness, or cramps. Also, while taking Abilify some elderly patients with dementia have suffered from strokes or mini strokes. Other patients may experience high blood sugar or the onset or worsening of diabetes. Lastly, if taken over long periods of time, the drug can induce death. *Hansen v. Baxter Healthcare Corp., 764 N.E.2d 35, 42 (Ill. 2002).*

The plaintiff took the medication because her depression and anxiety heightened and she trusted Dr. Moolayil. After she took the medication, she began to hallucinate. Hallucinations are not part of the common, uncommon or rare side affects that were listed on the website for the drug Abilify. This is due to the fact that all the known possible side affects had not yet been discovered because the drug had only been on the market for about one and a half years during the time it was prescribed for the plaintiff. The side affect from the drug produced a hallucination in the form of a long, very thick, white, bloody snake which was wrapped around the plaintiff's neck. However, the image was not real. The plaintiff called Dr. Moolayil in May of 2004 to complain about his diagnosis as well as the side affects from the medication. He intentionally ignored the patient's complaint.

10

Dr. Moolayil also breached his standard duty of care because he did not take into consideration any preexisting conditions and other medications that the plaintiff was using while under his care. The plaintiff told the doctor that she was also being treated for high blood pressure when she counseled with him during her first visit. The medications that the plaintiff disclosed that she was using were hydrochlorothiazide and potassium. The plaintiff disclosed this information because she knew how important it was to be honest with her doctor and the fact that her health could be in great danger if she was taking too many of the wrong kind of drugs simultaneously. Dr. Moolayil failed to warn the plaintiff about the rare side affect of a sudden change in blood pressure related to the drug's use.

In medicine, a contraindication is a condition or factor that increases the risks involved in using a particular drug, carrying out a medical procedure, or engaging in a particular activity. Some contraindications are *absolute,* meaning that there are no reasonable circumstances for undertaking a course of action. For example, a baby with a fever should never be given aspirin because of the risk of Reye's syndrome, and a person with an anaphylactic food allergy should never eat that food. Other contraindications are *relative,* meaning that the patient is at higher risk of complications, but that these risks may be outweighed by other considerations or mitigated by other measures. For example, a pregnant woman should normally avoid getting X-rays, but the risk may be far less than the risk of not diagnosing or being able to treat a serious condition such as tuberculosis or a broken bone. Hypersensitivity is a contraindication for the drug Abilify. Obesity, as a preexisting condition, often leads to diabetes among African-Americans because their diets contain vast amounts of starches and saturated fats. The plaintiff was more than twenty-five pounds overweight at the time Dr. Moolayil prescribed the drug for her use. Lastly, the plaintiff complained to Dr. Moolayil about the hallucination she experienced after taking the

11

drug Abilify. Dr. Moolayil remained willfully and consciously indifferent. Her never directed her to stop using the drug.

Dr. Moolayil breached his standard duty of care by engaging in gross negligence through fraud and also by failing to research the drug Abilify because it had been out on the market for less than two years at the time he prescribed it for the plaintiff. Most importantly, he willfully failed to warn the plaintiff about the potential risks and harmful side affects of the drug. Dr. Moolayil either received money through a bribe, he was coerced (meaning he was punked) or he remained willfully indifferent and took advantage of a mentally disabled woman who had no legal representation.

While the plaintiff was under Dr. Moolayil's care, she filled her prescriptions at a local Walgreens pharmacy in Dolton, IL. Every month, the plaintiff used Walgreens to fill one prescription for two high blood pressure medications, one prescription for depression and one prescription for anxiety. The pharmacist, acting as an agent on behalf of Walgreens had a fiduciary responsibility and duty to warn the patient's psychiatrist as well as the patient of the serious risks involved with taking the drug Abilify. The pharmacist never warned the plaintiff about the drug's serious side affects or its contraindication of hypersensitivity when used with other drugs like high blood pressure medication. Abilify, when taken over a period of time also affects the patient's blood sugar levels. Because the pharmacist failed to warn the plaintiff or her psychiatrist about all the potential dangers relating to the patient's mental and physical health based on the prescriptions they filled for her as well as her physical appearance, they became liable in the act of gross negligence. This information was especially important because the plaintiff was under the care of her primary health care physician and being treated her for high

12

blood pressure. Francine Y. disclosed her diagnosis and treatment for high blood pressure to the Chicago Transit Authority, the Illinois Department of Human Rights, Walgreens and Dr. Kumar Moolayil. Another important fact is that the plaintiff made physical appearances in person each time she filled her prescriptions at Walgreens. Because she made physical appearances, one could visibly see that she was overweight. Over the six month period while the plaintiff was on medical leave, the pharmacists could have easily looked at the plaintiff's prescriptions and saw that the psychiatrist kept increasing the strength of the plaintiff's medications with an abrupt change that included an additional, extremely dangerous medication. The pharmacy owed the plaintiff and her psychiatrist the fiduciary responsibility and duty to warn about the drug's contraindication as well as its ability to produce a multitude of negative side effects. The plaintiff, Francine Y., never received any warning from the pharmacist or her psychiatrist. Also, during the time that the drug was prescribed for the plaintiff, Abilify had only been on the market for about one and a half years. Since this is a very short time and the drug is extremely dangerous, Walgreens owed the plaintiff the fiduciary responsibility of monitoring the drug, its patient's use and additional dangerous side affects. Lastly, if Walgreens did not have Dr. Moolayil's signature on file, they should not have been filling any of the patient's prescriptions. In the case of *Happel v. Wal-Mart Stores, Inc., 766 N.E.2d 1118, 1127,* the pharmacy had knowledge of patient's allergy and drug contraindication. As a result, the court ruled that the pharmacy had a duty to either notify physician or warn the patient of the potential danger. The drug's name itself, Abilify, is derived from the word ability. This name should have presented a question in the minds of the pharmacist and the pharmacy as to what the drug's abilities and capabilities entail.

Dr. Moolayil conspired along with the Chicago Transit Authority through the use of coercion, willful indifference, conscious indifference and wantonness in an effort to fraudulently progress the plaintiff to an extreme prognosis of two psychotic mental illnesses. The conspirator's intent was to outwardly deceive, inflict pain, deliberately break the law, separate the plaintiff from service with the Chicago Transit Authority and eventually segregate her in society by placing her into a mentally ill institution. This conspiracy was intentional and done with malice which caused great harm to the plaintiff. They placed their own interests above the interests of an innocent, mentally handicapped, African-American, Christian woman. The Chicago Transit Authority and Dr. Kumar Moolayil took advantage of the plaintiff because she was without legal representation. They were in a position of authority and power, but took no measure to use their power and influence to protect, defend or assist the plaintiff. Francine Y. needed their help more than anything else.

Because Dr. Moolayil and Dr. Angulo breached their duty by deviating from what a prudent psychiatrist and primary health care physician would have done, the plaintiff sustained many additional injuries. Francine Y. became severely depressed, her anxiety heightened, she became homeless, experienced a lot of additional harassment, sexual harassment, retaliation, persecution, heavy surveillance by police officers, a false arrest, a false battery charge, and was perceived to be psychotic and dangerous by others. The plaintiff trusted both doctors. Because they failed to fulfill their fiduciary duty to the plaintiff as their patient, their breach of duty was one of the approximate causes of the plaintiff's mental and emotional distress becoming greater than it was. Also, when the plaintiff returned to work on May 27, 2004, Dr. Ismael Angulo examined the plaintiff and diagnosed her with Schizophrenia. Dr. Angulo is an agent for the Chicago Transit Authority. He is not a psychiatrist. He fraudulently diagnosed the plaintiff with the psychotic

14

mental illness of schizophrenia without any objective medical evidence to support his diagnosis. This harmed the plaintiff because Dr. Angulo conspired along with CTA's Vice President, Paul Fish and Dr. Moolayil by using fraudulent diagnoses to wrongfully discharge the plaintiff from service with the Chicago Transit Authority. Their intent to characterize the plaintiff as such was reckless and it was done with malice.

Paranoia is often associated with psychotic illnesses, particularly schizophrenia, although attenuated features may be present in other primarily non-psychotic diagnoses, such as paranoid personality disorder. Paranoia is a disturbed thought process characterized by excessive anxiety or fear, often to the point of irrationality and delusion. The plaintiff, Francine Y., has never been afflicted with paranoia or schizophrenia. The defendants were trying to have her removed from CTA's workplace because they did not have an equitable defense in a true court of law. Also, extreme cases of mental illness are difficult to prove. Instead they resorted to lies, fraudulent employment practices, conspiracy, fraud and coercion in an effort to wrongfully discharge the plaintiff. As time progressed, the plaintiff's mental and emotional state grew worse. She became homeless, enduring homelessness and its side affects for about three years. *Francine Yates v. The Illinois Department of Human Rights, The Chief Legal Counsel and The Chicago Transit Authority, 1-06-3107.*

Francine Y.; the plaintiff, was also inflicted with intentional emotional and mental distress by Dr. Kumar Moolayil, Walgreens, the Illinois Department of Human Rights, the City of Chicago and the Chicago Transit Authority. A reckless disregard for the likelihood of causing the plaintiff distress occurred when the plaintiff was conspired against by diagnosing her with fraudulent psychiatric conditions that she did not have. These diagnoses were used to remove the plaintiff

from service with the Chicago Transit Authority. The plaintiff, Francine Y., was outraged when she was being diagnosed with paranoia and schizophrenia which were used as the basis for her separation from service with the Chicago Transit Authority because of the reckless and malicious intent to conspire against her. The plaintiff, Francine Y., was vulnerable because she was an African-American woman who was mentally handicapped and without effective legal representation. Dr. Moolayil and the Chicago Transit Authority were both aware of the fact that the plaintiff was a black woman who was mentally disabled and without effective legal representation. Dr. Moolayil, the Chicago Transit Authority, the City of Chicago and the Illinois Department of Human Rights were all aware if these prima facie facts. The first day the plaintiff came to see Dr. Kumar Moolayil for treatment, she engaged herself in a full discussion with the doctor about her referral to seek professional help. After she explained the nature of her problem which involved sexual harassment and workplace discrimination, Dr. Moolayil asked if the plaintiff had an attorney. The plaintiff stated "No, I don't." The defendants were all in positions of power. Because the plaintiff was without legal representation, they conspired, took advantage of the situation and remained willfully and consciously indifferent. More than likely, Paul Fish conspired with Dr. Moolayil by giving him a copy of the memorandum dated November 14, 2003 that he placed in the plaintiff's personnel file without her knowledge or consent. Lastly, the defendants owed the plaintiff the fiduciary responsibilities and duties of: giving her a correct, just and ethical medical evaluation; warning about the drug's contraindications and side affects, and abiding by the law. These actions, subsequent actions and all other actions that followed made the plaintiff's emotional and mental distress greater than it was from the beginning. It became worse as time progressed and she endured the trauma of homelessness, its side effects, increased harassment, sexual harassment, heavy surveillance, retaliation and coercion.

Their intent to outwardly deceive, inflict pain and break the law was intentional and deliberate. It was also done with malice. They placed their own interests above the interests of an innocent, mentally handicapped, homeless, African-American, Christian woman. They were in positions of authority, but took no measure to use their power and influence to protect, defend or assist the plaintiff. The plaintiff, Francine Y., needed their help more than anything else. *Richard Goldberg, M.D. v. The Department of Professional Regulation, Nikki Zollar, Patricia L. Daniels and The Medical Disciplinary Board 1-99-3099.*

**The Medical Practice Act of 1987** *225 ILCS 60/22* sates the following in Section 22. Disciplinary action. A) The Department may revoke, suspend, place on probationary status, or take any other disciplinary action as the Department may deem proper with regard to the license or visiting professor permit of any person issued under this Act to practice medicine, or to treat human ailments without the use of drugs and without operative surgery upon any of the following grounds: (4) Gross negligence in practice under this Act. (5) Engaging in dishonorable, unethical or unprofessional conduct of a character likely to deceive, defraud or harm the public. (6) Obtaining any fee by fraud, deceit, or misrepresentation. (9) Fraud or misrepresentation in applying for, or procuring, a license under this Act or in connection with applying for renewal of a license under this Act .(10) Making a false or misleading statement regarding their skill or the efficacy or value of the medicine, treatment, or remedy prescribed by them at their direction in the treatment of any disease or other condition of the body or mind. (20) Immoral conduct in the commission of any act including, but not limited to, commission of an act of sexual misconduct related to the licensee's practice. (21) Willfully making or filing false records or reports in his or her practice as a physician, including, but not limited to, false records to support claims against the medical assistance program of the Department of Public Aid under

17

the Illinois Public Aid Code. 22) Willful omission to file or record, or willfully impeding the filing or recording, or inducing another person to omit to file or record, medical reports as required by law, or willfully failing to report an instance of suspected abuse or neglect as required by law.  (24) Solicitation of professional patronage by any corporation, agents or persons, or profiting from those representing themselves to be agents of the licensee. (25) Gross and willful and continued overcharging for professional services, including filing false statements for collection of fees for which services are not rendered, including, but not limited to, filing such false statements for collection of monies for services not rendered from the medical assistance program of the Department of Public Aid under the Illinois Public Aid Code. (26) A pattern of practice or other behavior which demonstrates incapacity or incompetence to practice under this Act. (30) Willfully or negligently violating the confidentiality between physician and patient except as required by law. (31) The use of any false, fraudulent, or deceptive statement in any document connected with practice under this Act.  (32) Aiding and abetting an individual not licensed under this Act in the practice of a profession licensed under this Act (36) Failure to report to the Department any adverse judgment, settlement, or award arising from a liability claim related to acts or conduct similar to acts or conduct which would constitute grounds for action as defined in this Section.  (37) Failure to transfer copies of medical records as required by law.  (38) Failure to furnish the Department, its investigators or representatives, relevant information, legally requested by the Department after consultation with the Chief Medical Coordinator or the Deputy Medical Coordinator.  (39) Violating the Health Care Worker Self Referral Act.  (41) Failure to establish and maintain records of  patient care and treatment as required by this law.

**735 ILCS 5/2 1706.5  Standards for Economic and Non-economic Malpractice Damages** In any medical malpractice action or wrongful death action based on medical malpractice in which economic and non economic damages may be awarded, the following standards shall apply: (1) In a case of an award against a hospital and its personnel or hospital affiliates, as defined in Section 10.8 of the Hospital Licensing Act, the total amount of non economic damages shall not exceed $1,000,000 awarded to all plaintiffs in any civil action arising out of the care. 2) In a case of an award against a physician and the physician's business or corporate entity and personnel or health care professional, the total amount of non-economic damages shall not exceed $500,000 awarded to all plaintiffs in any civil action arising out of the care. (3) In awarding damages in a medical malpractice case, the finder of fact shall render verdicts with a specific award of damages for economic loss, if any, and a specific award of damages for non economic loss, if any.   The trier of fact shall not be informed of the provisions of items (1) and (2) of this subsection (a). (b) In any medical malpractice action where an individual plaintiff earns less than the annual average weekly wage, as determined by the Illinois Workers' Compensation Commission, at the time the action is filed, any award may include an amount equal to the wage the individual plaintiff earns or the annual average weekly wage. *(See Exhibits A-I)*

## *Charge B:  Discrimination/Basis:  Disability, Diagnosis = Major Depression & Anxiety*

The plaintiff, Francine Y., was treated and diagnosed in 2003 with major depression and anxiety by Dr. Kumar Moolyail.   It is an uncontested fact that the plaintiff is suffering from extreme depression and anxiety which are disabilities defined and protected under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act as well as other laws. She complained to doctor Moolyil about engaging in the protected activity of filing a lawsuit against the Chicago Transit Authority.    While under Dr. Moolayil's and Dr. Angulo's care, the plaintiff

19

perceived that she was being stereotyped as being psychotic and crazy. This was evident because both doctors diagnosed the plaintiff with psychotic mental illnesses without the consent and professional objective medical opinion of other doctors involved in the care and treatment of these diseases. Dr. Kumar Moolayil kept increasing the plaintiff's dosage and strength of her depression and anxiety medications without any objective medical or scientific evidence. Francine Y. also perceived that the Illinois Department of Human Rights also believed that she was afflicted with theses psychotic illnesses because they allowed the fraudulent documents to be admitted in legal proceedings as substantial evidence on behalf of the defendant's defense. The plaintiff also perceived that she was being stereotyped and segregated by the verbal, nonverbal and implied actions of the defendants. Because of the doctors' willful and conscious indifference as well as their unwholesome disregard for the plaintiff, they took advantage of a mentally ill, African-American woman who was without legal representation. Dr. Moolayil knew the plaintiff was suffering from major depression and anxiety because he diagnosed her and treated her for those disabilities which are defined and protected under the ADA and Section 504 of the Rehabilitation Act. The doctor also kept the plaintiff on a six month leave of absence in an effort to provide her with effective treatment for her disabilities. While under his care, the doctor conspired with the Chicago Transit Authority to have the plaintiff removed from CTA's workplace as an act of retaliation and eventually segregated in society by placing her into a mentally ill facility. The plaintiff was separated from employment with the Chicago Transit Authority because she was fraudulently diagnosed with paranoia and schizophrenia. Also, because the plaintiff could not obtain suitable employment, she became homeless and has endured homelessness for about three years. Dr. Kumar Moolayil's medical practice, the CTA, the City of Chicago and the Illinois Department of Human Rights have demonstrated their

20

effectiveness in breaking laws which severely wound, undermine and ostracize mentally disabled African-American women.

On June 22, 1999, the United States Supreme Court held in *Olmstead v. L.C.* that the unnecessary segregation of individuals with disabilities in institutions may constitute discrimination based on disability. The court ruled that the Americans with Disabilities Act may require states to provide community-based services rather than institutional placements for individuals with disabilities. This historic pronouncement makes attainable a goal long-sought by people with disabilities and advocates. *Olmstead v. L.C. (98-536) 527 U.S. 581 (1999) 138 F.3d 893.* A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities. *28 C.F.R. § 35.130(d).*

**The Americans with Disabilities Act of 1990 (ADA)** prohibits discrimination on the basis of disabilities in employment, state and local government, public accommodations, commercial facilities, transportation, and telecommunications. The ADA also prohibits private employers, state and local governments, employment agencies and labor unions from discriminating against qualified individuals with disabilities in job application procedures, hiring, firing, advancement, compensation, job training, and other terms, conditions, and privileges of employment. The ADA covers employers with fifteen or more employees, including state and local governments. It also applies to employment agencies, labor organizations and to the United States Congress. To be protected by the ADA, one must have a disability or have a relationship or association with an individual with a disability. An individual with a disability is defined by the ADA as a person who has a physical or mental impairment that substantially limits one or more major life activities, a person who has a history or record of such an impairment, or a person who is perceived by others as having such an impairment. Major life activities are activities that an

21

average person can perform with little or no difficulty such as walking, breathing, seeing, hearing, speaking, learning, and working. A qualified employee or applicant with a disability is an individual who, with or without reasonable accommodation, can perform the essential functions of the job in question. An employer is required to make a reasonable accommodation to the known disability of a qualified applicant or employee if it would not impose an "undue hardship" on the operation of the employer's business.    Reasonable accommodations may include, but are not limited to making existing facilities used by employees readily accessible to and usable by persons with disabilities; job restructuring, modifying work schedules, reassignment to a vacant position; acquiring or modifying equipment or devices, adjusting or modifying examinations, training materials, or policies and providing qualified readers or interpreters. An undue hardship is defined as an action requiring significant difficulty or expense when considered in light of factors such as an employer's size, financial resources, and the nature and structure of its operations. *42 U.S.C. § 12111–12117.*

The ADA's nondiscrimination standards also apply to federal sector employees under section **501 of the Rehabilitation Act**, as amended, and its implementing rules. Also, **Section 504 of the Rehabilitation Act of 1973** is "designed to eliminate discrimination on the basis of a disability in any program or activity receiving Federal financial assistance and ensure individuals with disabilities the opportunity to pursue their employment, education, and recreational goals free from discrimination.    *29 U.S.C. Section 794.*    A "disabled person" is one "who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." *29 U.S.C. Section 706(8)(B).*    A "physical or mental impairment" is "any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or

22

more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular, reproductive, digestive, genito-urinary; hemic and lymphatic; skin; and endocrine, or "(b) any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities. *34 CFR 104.3(j)(20)(i), 45 CFR 84.3(j)(2)(i).*

Reasonable Adjustments/modifications may be required as necessary to prevent discrimination (such as adjusting the time permitted to finish degree requirements, substituting specific courses required to complete degree requirements, and adapting the manner in which specific courses are conducted.) Tests must measure the student's achievement, not his or her impaired sensory, manual, or speaking skills (except when that skill is the factor being measured). Auxiliary aids may be required such as taped texts, interpreters, or other effective methods of making orally delivered materials available to students with hearing impairments; readers in libraries for students with visual impairments; and classroom equipment adapted for use by students with manual impairments. Private colleges and universities that receive federal assistance are already subject to the nondiscrimination provisions of Section 504 of the Rehabilitation Act of 1973. Areas of impact are wide, including employment, student services, and public services. Discrimination must be eliminated in recruitment, admissions, courses, and tests. Facilities, libraries, and housing must be accessible. Athletics and extra-curricular activities must be available to individuals with disabilities. Services and events available to the public generally must also be accessible and available on an equal basis to individuals with disabilities. This includes, museums, exhibits, cultural events, athletic events and transit systems. Lastly, voluntary and involuntary treatment of mentally ill and disabled persons in Illinois is illegal and governed by the **Mental Health and Developmental Disabilities Code.** The Code states that no

23

recipient of services shall be deprived of any rights, benefits, or privileges guaranteed by law, the Constitution of the State of Illinois, or the Constitution of the United States solely on account of the receipt of such services. *405 ILCS 5/2-100(a) (See Exhibits*

**The Illinois Human Rights Act,** *(775 ILCS 5/1-102),* states that it is the public policy of the state of Illinois for: **(A) Freedom from Unlawful Discrimination.** To secure for all individuals within Illinois the freedom from discrimination against any individual because of his or her race, color, religion, sex, national origin, ancestry, age, marital status, physical or mental disability, military status, sexual orientation, or unfavorable discharge from military service in connection with employment, real estate transactions, access to financial credit, and the availability of public accommodations. **(E) Public Health, Welfare and Safety.** To promote the public health, welfare and safety by protecting the interest of all people in Illinois in maintaining personal dignity, in realizing their full productive capacities, and in furthering their interests, rights and privileges as citizens of this State. **(F) Implementation of Constitutional Guarantees.** To secure and guarantee the rights established by Sections 17, 18 and 19 of Article I of the Illinois Constitution of 1970. **(G) Equal Opportunity, Affirmative Action.** To establish Equal Opportunity and Affirmative Action as the policies of this State in all of its decisions, programs and activities, and to assure that all State departments, boards, commissions and instrumentalities rigorously take affirmative action to provide equality of opportunity and eliminate the effects of past discrimination in the internal affairs of State government and in their relations with the public. **(H) Unfounded Charges.** To protect citizens of this State against unfounded charges of unlawful discrimination, sexual harassment in employment and sexual harassment in higher education, and discrimination based on citizenship status in employment.

The **1970 Illinois Constitution** states the following: **Article I, Section 19: No Discrimination Against The Handicapped** All persons with a physical or mental handicap shall be free from discrimination in the sale or rental of property and shall be free from discrimination unrelated to ability in the hiring and promotion practices of any employer. *(See Exhibits A-I)*

### *Charge C: Retaliation/Basis: For Opposing Unlawful Discrimination*

The plaintiff engaged in the protected activities of filing an employment charge of discrimination against the CTA, the Illinois Department of Human Rights and the City of Chicago in 2004, 2006 and 2007. Also, on June 13, 2008, the plaintiff engaged in the protected activity of complaining about the additional harassment, sexual harassment, a false arrest, heavy surveillance and coercion that she was experiencing from the CTA and Mayor Richard Daley's office. She complained to the FBI under the direction of Patrick Fitzgerald's office. As a result, this case has escalated to a high profile Federal case. Francine Y. was retaliated against by the Chicago Transit Authority, the City of Chicago, the State of Illinois and Dr. Moolayil. The retaliation consisted of the following acts: **1.)** Paul Fish; Vice President of CTA, fraudulently diagnosing the plaintiff with paranoia via a memorandum that was placed in the plaintiffs file without her knowledge or consent, Paul Fish is not a doctor; **2.)** allowing the plaintiff to be diagnosed with the mental illness Schizophrenia from CTA's Dr. Ismael Angulo who is not a psychiatrist; **3.)** not sending the plaintiff to see one of CTA's internal psychiatrists; **4.)** placing fraudulent documents in the plaintiff's file without her knowledge or consent; **5.)** denying the plaintiff the chance to apply for a workmen's compensation leave of absence; **6.)** Dr. Angulo sexually abusing the plaintiff and then fraudulently separating her from service; **7.)** using the plaintiff's fraudulent diagnosis of schizophrenia as the basis for her separation from employment

but concealing the fact by telling the plaintiff that she was being separated because she failed to return to work in a timely manner; **8.)** the act of Dr. Moolayil fraudulently increasing the patient's dosage and strengths of her anxiety and depression medications; **9.)** the act of Dr. Moolayil conspiring with CTA to fraudulently diagnose the plaintiff with paranoia which she does not have; **10.)** the act of Dr. Moolayil not sending the plaintiff for a second opinion; **11.)** the act of the Illinois Department of Human Rights admitting fraudulent documents as substantial evidence into judicial proceedings; **12.)** Dr. Moolayil not citing the appropriate objective medical evidence, but trying to cover the fraud by adding fraudulent notes to the plaintiff's medical file; **13.)** the act of keeping the plaintiff on a fraudulent medical leave of absence; **14.)** the act of Dr. Moolayil not researching the drug Abilify and warning the plaintiff about the drug's contraindications and its potential side affects; **15.)** the act of Dr. Moolayil not discontinuing the plaintiff's use of the drug Abilify when she complained about the side affect of hallucinations that she experienced from taking the drug; **16.)** denying the plaintiff the right to her unemployment compensation benefits when the company had voluntary discharged her from service; **17.)** not calling COBRA for the plaintiff when the Federal law states that the company must do so at the time of involuntary separation from employment; **18.)** not sending the plaintiff the COBRA enrollment forms when the company was aware that she was ill and the fact that her injuries were sustained from employment related discrimination; **19.)** the act of harassing the plaintiff off of CTA's premises when she returned to work on April 27, 2004; **20.)** the act of Walgreens and the pharmacist failing to warn the plaintiff about the drug's contraindications and the rare side effect of a change in high blood pressure. The defedants' actions followed the plaintiff's protected activities within such a reasonable period of time, directly raising the inference of retaliatory motivation.

**Title I of the American with Disabilities Act** states that it is unlawful to retaliate against an individual for opposing employment practices that discriminate based on disability or for filing a discrimination charge, testifying, or participating in any way in an investigation, proceeding or litigation under the Americans with Disabilities Act.

The **Title VII Civil Rights Act of 1964** states that an employer may not fire, demote, harass or otherwise "retaliate" against an individual for filing a charge of discrimination, participating in a discrimination proceeding, or otherwise opposing unlawful discrimination. Retaliation occurs when an employer, employment agency, or labor organization takes an **adverse action** against a **covered individual** because he or she engaged in **a protected activity**. *775 ILCS 5/6-101(A)(2006). (See Exhibits A-I)*

### *Charge D: Defamation of Character*
Defamation of character is a false and unprivileged spoken word or written publication which exposes any living person to hatred, contempt, ridicule, or which causes him/her to be shunned or avoided, or which has a tendency to injure him/her in his/her trade or occupation. The plaintiff, Francine Y., was a public service official because she worked in the Capital Investment office of the Chicago Transit Authority. Because Paul Fish and Dr. Kumar Moolayil intentionally perceived the plaintiff to be afflicted with paranoia, Francine Y.'s character was defamed. They made others treat her as if she was a dangerous criminal. When the plaintiff returned to work on June 3, 2008, Angela King and Alana Bates were given special permission to be removed from the office as if Francine was going to cause harm to them. The Chicago Transit Authority authorized two male security guards to escort Francine Y. off of CTA's

27

premises as if she was a violent criminal. Paul Fish placed a memorandum in the plaintiff's permanent employment file and it stated that the plaintiff's co-workers were afraid of her, that she was causing the work environment to deteriorate and making irrational outbursts directed at her co-workers. These are blatant lies.        The plaintiff opposed unlawful discrimination and engaged in the protected activity of complaining about harassment, sexual harassment and retaliation in 2004, 2006, and 2007. Also, on June 13, 2008, the plaintiff placed a call to the FBI under the direction of Patrick Fitzgerald's office to report the additional harassment, sexual harassment, fraud, embezzlement and coercion that she was experiencing at the hands of Ronald Huberman and Mayor Richard Daley.

There are also other examples of how the plaintiff was perceived as being crazy and dangerous by others. While living within the PGM homeless facility, Francine Y. was perceived as being psychotic and referred to see a psychiatrist after she reported a homeless person for threatening to do bodily harm to her, The John Marshall Law School perceived the plaintiff to be dangerous because they referred her to security after she disclosed her disabilities and opposed unlawful discrimination. Lastly, a John Marshall Law School employee; Olga, walked past the plaintiff and perceived her to be dangerous. This was evident because when she passed the plaintiff, Olga walked on the edge of the sidewalk in an effort to avoid the plaintiff as if the plaintiff would cause her bodily harm. *New York Times Co. v. Sullivan, 376 U.S. 254 (1964). (See Exhibits A-I)*

### *Charge E:  Fraud and Fraudulent Acts*
Fraud, in addition to being a criminal act, is also a type of civil law violation known as a tort.  A tort is a civil wrong for which the law provides a remedy. A civil fraud typically involves the act of intentionally making a false representation of a material fact, with the intent to deceive, which is reasonably relied upon by another person to that person's detriment. A "false representation"

can take many forms, such as: a false statement of fact, known to be false at the time it was made; a statement of fact with no reasonable basis to make that statement; a promise of future performance made with an intent, at the time the promise was made, not to perform as promised; a statement of opinion based on a false statement of fact; a statement of opinion that the maker knows to be false; or an expression of opinion that is false, made by one claiming or implying to have special knowledge of the subject matter of the opinion. "Special knowledge" in this case means knowledge or information superior to that possessed by the other party, and to which the other party did not have equal access.

Dr. Kumar Moolayil intentionally diagnosed the plaintiff with paranoia and told her that the objective medical evidence that was the basis for his diagnosis was that the plaintiff was talking too fast. The statement was false, known by him to be false at the time it was made and used to deceive a mentally handicapped, African-American, Christian woman who had no effective legal representation. The documented evidence of the plaintiff's fraudulent disability is also an act of perjury because the document needs to be admitted as evidence in a court of law.

Perjury is the act of lying or making verifiably false statements on a material matter in a court of law or in any of various sworn statements in writing. It is important that the false statement be material to the case at hand—that it could affect the outcome of the case. Perjury can also be interpreted as a form of fraud. Perjury is considered a serious offense as it can be used to usurp the power of the courts; resulting in miscarriages of justice; or as in the case of 1-06-3107, overt abortions of justice. In the United States, the general perjury statute under Federal law provides for a prison sentence of up to five years, and is found at *18 U.S.C. 1621 and 28 U.S.C. 1746*.

29

In the case of *Francine Yates v. The Illinois Department of Human Rights, the Chief Legal Counsel and the Chicago Transit Authority, 1-06-3107,* the defendants used vicious lies, fraudulent employment practices and the admission of fraudulent medical documents as substantial evidence into legal proceedings. Paul Fish; CTA's Vice President of Capital Investment, placed a memorandum dated November 14, 2003 in the plaintiff's employment file without her knowledge or consent. The memo stated that the plaintiff was exhibiting a growing degree of a mental psychotic condition known as paranoia. The plaintiff is not mentally ill as perceived by Paul Fish and Paul Fish is not a doctor. His motive for retaliating against the plaintiff and diagnosing her with a psychotic condition stems from the fact that he has knowledge of federal and state funds that are being embezzled from capital dollars used to fund CTA's capital improvement projects. Before Paul Fish came on board with the CTA, he worked for the RTA which is a board that directs how government funds are to spent at CTA, PACE and METRA.

Paranoia is often associated with psychotic illnesses, particularly schizophrenia, although attenuated features may be present in other primarily non-psychotic diagnoses, such as paranoid personality disorder. Paranoia is a disturbed thought process characterized by excessive anxiety or fear, often to the point of irrationality and delusion. Schizophrenia is the medical condition that the plaintiff was diagnosed as having by Dr. Ishmael Angulo, a doctor who works for the CTA. Dr. Ishmael Angulo is not a psychiatrist nor did he examine the plaintiff for any mental illnesses. Dr. Kumar Moolayil conspired along with the Chicago Transit Authority and the Illinois Department of Human Rights to fraudulently diagnose the plaintiff with a psychotic illness so extreme that she would have to be removed from the workplace and eventually from society by being placed within a mental institution. Dr. Moolayil either received money through

bribery, was coerced or he remained willfully indifferent and intentionally made the wrongful diagnosis.   The State of Illinois is directly responsible for allowing the fraudulent medical documents to be used as substantial evidence for admission into judicial proceedings.   The Department has a legal team which should be skilled in the law.   The should have used the Mental Health and Developmental Disabilities Code for establishing psychiatric testimony to rule the decision of the plaintiff's wrongful discharge because of her fraudulent disabilities as being unconstitutional on its face.   Paul Fish is not a doctor and Dr. Ismael Angulo is not a psychiatrist.

The non-rhetorical question within this scenario is how many other patients has Dr. Moolayil done this to and how many are being kept fraudulently under his medical care in an effort for Dr. Moolayil to fill his pockets by defrauding private insurances and Medicare?   On Friday, July 25, 2008, the plaintiff called Dr. Moolayil's office to obtain her medical file.   The secretary told her it would take some time to get the file because she was treated several years ago and the fact that Dr. Moolayil has about 12,000 patients.   This is a large number of patients for one doctor to treat in a given year even if he treats eight patients per day.   Some would even believe that Dr. Moolayil is mainly writing prescriptions as opposed to providing effective, competent counseling and medical care along with the use of appropriate medication.   The plaintiff, Francine Y., has never been afflicted with paranoia or schizophrenia.   The defendants were trying to have her removed from society and eventually committed into a mental institution.   The two parties were collaborating through cohesive measures while the plaintiff was on a medical leave of absence. Dr. Kumar Moolayil was either punked, paid or both.   *Cruzan v. Missouri Department of Health, 497 U.S. 261, 278 (1990).*

31

On June 22, 1999, the United States Supreme Court held in *Olmstead v. L.C.* that the unnecessary segregation of individuals with disabilities in institutions may constitute discrimination based on disability. The court ruled that the Americans with Disabilities Act may require states to provide community-based services rather than institutional placements for individuals with disabilities. This historic pronouncement makes attainable a goal long-sought by people with disabilities and advocates. *Olmstead v. L.C. (98-536) 527 U.S. 581 (1999) 138 F.3d 893.* A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities. *28 C.F.R.§ 35.130(d).* *(See Exhibits A-I)*

## III. CONCLUSION

The Chicago Transit Authority had several employees conspiring against the plaintiff as well as outside entities associated with this case. Some of the outside entities were a law school, Chicago police officers and Dr. Kumar Moolayil. This was done because the plaintiff had knowledge that money has been embezzled out of CTA's pension fund. However, the conspirators were doing a very poor job of working together. Paul Fish's and Dr. Moolayil's erroneous perception of the plaintiff as a mentally disabled employee, their willful intention to commit fraud and all other actions relating to such helped to increase the liability associated with this case. The defendants had no legal remedies that they could use in a court of law, so they resorted to fraud and fraudulent activities in lieu of an equitable defense. The plaintiff, Francine Y., was intentionally discriminated against by Dr. Kumar Moolayil, The Chicago Transit Authority and the Illinois Department of Human Rights because she opposed unlawful discrimination. Their intent to do so was reckless, malicious and overwhelmingly destructive. The defendants were all in a position of power. They knew the plaintiff was an African-

American woman who was mentally disabled and without effective legal representation. They took advantage of the situation because they thought that they were going to get away with it. However, the plaintiff took a stand in the face of adversity and opposed unlawful discrimination, enduring a great deal of persecution. Dr. Kumar Moolayil was in a position to help the plaintiff; however, he chose to break the law by intentionally ignoring the plaintiff's complaints, violating her rights, aiding, abetting and obstructing justice.    This case should be an embarrassment, a shame and a disgrace to Dr. Kumar Moolayil, the Chicago Transit Authority, the Illinois Department of Human Rights and the City of Chicago. The plaintiff, Francine Y., is asking for a summary judgment to be rendered in favor of the plaintiff with no appeals granted on behalf of the defendants. The plaintiff is also seeking relief from the district court in the form of the following remedies: injunctive relief, all harassers to be disciplined and separated from service, damages for mental anguish/mental cruelty, psychological & emotional pain from suffering, shame, indignity, disgrace, embarrassment, humiliation, demoralization, anger, discomfort, inconvenience, delay, worry, distress, anxiety, stress, malice, oppression, conscious indifference, willful indifference, deep depression, homelessness & side affects, feelings of sorrow, torment, powerlessness and exclusion, future continued indefinite suffering, damages for intentional infliction of emotional and mental distress, damages for negligent intentional infliction of emotional and mental distress, damages for a diminished quality of life, loss of opportunity potential, attorney fees, expert witness fees, punitive damages, pecuniary/non-pecuniary damages, damages for malpractice, all workplace torts, damages for fraud & conspiracy to commit fraud, all actions enabling the applicant to be made whole, all other compensatory damages.

33

## PROOF OF SERVICE

I, the undersigned plaintiff, certify that on the _____ day of _____, _____, I
served a copy of this _____ to each person to whom it is directed by
way of _____.


TO:    Dr. Kumar Moolayil              The Illinois Department of Human Rights
       15475 S. Park Avenue            Attn:  Chief Legal Counsel
       South Holland, IL  60473        100 W. Randolph Avenue
                                       Chicago, IL  60601


       The Chicago Transit Authority   The City of Chicago
       Attn:  Ronald Huberman          Attn:  Mayor Richard Daley
       567 W. Lake Street              121 N. LaSalle Street
       Chicago, IL  60606              Chicago, IL  60601


       Walgreens
       Attn:  Pharmacy Department
       1150 E. Sibley Blvd
       Chicago, IL  60419


                                       _Marcine Yates_
                                       Francine Yates, Pro Se
                                       14114 S. Edbrooke Avenue
                                       Riverdale, IL  60827
                                       (312) 351-5635

# APPENDIX

This disability notice must be filled out immediately. Return to Sedgwick CMS, P.O. Box 803947, Chicago, IL 60680-3947. I
duty to notify your immediate supervisor on your first day off. On your second day off, notify your work location and Sedgwic
(312) 759-2282.

**ATTENTION:**      Your claim benefits will not start until you are under the care of a licensed provider.

**\* IMPORTANT:**      This form is not to be used if sickness or injury is due to an injury on duty or recurrence of same.

## BOTTOM PORTION MUST BE COMPLETED BY LICENSED PROVIDER

Name: *YATES      FRANCINE                            N/A*
Last            First            Middle            Married

Address: *15439 S. DORCHESTER, UNIT # 2F, DOLTON IL 60419   (708) 841-5612*
Number    Street            City/Town   Zip Code   Phone Number

Age: *35*   Occupation—Type of Work: *FINANCIAL ANALYST 3*   Badge/Payroll Number: *41648*   Social Security Number: *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*

Department: *CAPITAL INVESTMENT*   Location: *222 Merchandise MART Plaza Chicago IL*   Union → N/A *EXEMPT employe*

Describe Type of Sickness or Injury: *MAJOR DEPRESSION AND ANXIETY*   Injured on Duty: *Yes*

First Day Unable to Work: *Wednesday   11/26/03*
Month           Day        Year

*KUMAR   MOOLAYIL*                                    *(708) 596-5622*
Name of Provider Attending                              Phone Number

Address: *15425 S. PARK   #102   South Holland, IL   60473*
Number            Street            City/Town        Zip Code

///////////////////////////////////////////////////////////////////////////////////////////////////

*To be completed by Employee*
AUTHORIZATION TO RELEASE INFORMATION: I hereby authorize the undersigned provider to release any information acquired
course of my examination or treatment to the CTA's Medical Director, Sedgwick CMS, Blue Cross/ Blue Shield and ComPsych to rele
CTA information necessary for the payment of Weekly Indemnity Benefits.

Signed: *Francine Yates*                              Date: *12/7/03*

///////////////////////////////////////////////////////////////////////////////////////////////////

TO BE COMPLETED BY LICENSED PROVIDER IMMEDIATELY AND RETURNED TO SEDGWICK CMS, P.O. BOX 803947,
CHICAGO, ILLINOIS 60680-3947

Patient's Name: *FRANCINE YATES*

First day evaluated for present condition: *12/2/03*                         *296.23*
                                                                   ICD 9 Code

Diagnosis/ Presenting Issue: *Major depression and anxiety*

Surgery (if applicable include date):

Treatment Plan (including meds): *Klonopin 0.5 mgm po BID / Lexapro 10mg po QD)*

What symptoms are preventing the patient from returning to work? *anxiety/depression/difficulty being around people.*

Duration of disability? *approximately 12 wks.*

Next Office visit date (if applicable): *12/29/03*

Signed: *Kumar Moolayil*                         Professional Designation: *MD*

Date: *12/15/03*

\* Provider Name: *KUMAR MOOLAYIL*

\* Provider Address: *15475 S. PARK #102 S. Holland IL 604*

\* Provider Phone Number: *708 596 2211*      \* Provider Fax Number: *708 596 5622*

# MEDICAL EXAMINER'S REPORT

NAME _Yates, Francine_     Emp. No. _41648_    Age _36_

Occupation _Sr. Cip Project Analyst_   Dept. _Capital investncy_   Entered Service Date _03-25-02_

Type of Examination _Dis Claim_       Absent since _11-26-03_

MEDICAL HISTORY: _Pt has been sick since 11/26/03 because depression and anxiety. she has..._ _[illegible handwriting]_

_04 MAY 27 AM 8:04_

MEDICATIONS:

SIDE EFFECTS OF MEDICATION:

OTHER PROBLEMS:

PHYSICAL EXAMINATION:   Temp. ___ Pulse ___ Resp. ___ BP _140/__

| N | ABN | REGION | DESCRIBE ABNORMALITIES |
|---|-----|--------|------------------------|
| ☐ | ☐ | Head | |
| ☐ | ☐ | Neck | |
| ☐ | ☐ | Heart and Lungs | |
| ☐ | ☐ | Abdomen | |
| ☐ | ☐ | Genitalia | |
| ☐ | ☐ | Spine | |
| ☐ | ☐ | Extremities | |
| ☐ | ☐ | Reflexes | |
| ☐ | ☐ | Neurological | |
| | | Other: | |

SPECIAL TESTS:

Urinalysis: PH ___ Albumen ___ Sugar ___ Bl. ___

Audiogram ___

ECG ___

DIAGNOSIS: _Depression — R/o schizophrenia_

DISPOSITION:   ☐ Fit for   ☐ Regular Duty   ☒ Unfit for any work   Appt. Date ___

REMARKS: _[illegible handwriting]_

Date _5/27/04_     Signed _[signature]_     M.D.

_EXHIBIT B_

DEA

**KUMAR MOOLAYIL, M.D.**
15475 SOUTH PARK AVENUE
SUITE 102
SOUTH HOLLAND, IL 60473
708-596-2211

NAME Francine Yates    DATE 4/26/04

ADDRESS

**R**

Has been unable to
work since 11/26/03
(through today)
Expected date
return to work
undecided

*EXHIBIT C*



# MEMORANDUM

TO:        File

FROM:     ·Paul F. Fish
           Vice President, Capital Investment

DATE:      November 14, 2003

SUBJECT:   **Request for Special Medical Assessment for Francine Yates (I.D. 41648)**

The purpose of this memo is to document the reasons for my request that a special medical assessment be made on the above employee.

Ms. Yates has been an employee of the CTA and the Capital Investment Department since March 25, 2002. Her current position is Financial Analyst III.

I am requesting a special medical assessment for Ms. Yates for the following reasons:

Over the past 4-6 months there has been a gradual, although dramatic, alteration in Ms. Yates' demeanor and general behavior. I have based this conclusion on changes which I have personally observed as well as on interviews I have had with her supervisor, the general manager, as well as with many of her co-workers.

There has been a general deterioration in her appearance, including grooming and dress. When she began working in Capital Investment, she normally wore appropriate business attire, which included business suits, and she was well groomed. In the recent months, Ms. Yates has often appeared ill-kempt in informal or soiled clothing, e.g. sweat pants and bedroom slippers.

Ms. Yates has exhibited increasingly bizarre and inappropriate behavior including laughter at inappropriate times, random noises, talking to herself, etc. This has been generally disruptive to the workplace environment. Further, Ms. Yates has exhibited a growing degree of paranoia, which she has expressed as people staring at her, plotting against her, picking on her, spying on her, and generally conspiring to harass her. On several occasions she has addressed her co-workers and supervisor with inappropriate verbal outbursts, accusing them of conspiracy and harassment. Employees at whom these outbursts have been directed include Endee Godson, Stan Pruitt, Ron Durr, Vernell Pouncey, as well as her supervisor Ernest Payne, in several incidents occurring between July and November 2003.

Finally, Ms. Yates' behavior has created an atmosphere of fear in the workplace. Her co-workers fear her irrational accusations and verbal outbursts. On November 12, 2003, following the most recent verbal outburst directed at a co-worker, Ms. Yates called 911 and requested assistance from the Chicago Police Department. After interviewing Ms. Yates, the police officers indicated that there was no basis for police involvement. Many of Ms. Yates' co-workers have expressed concerns that she will direct future outbursts at them. This has resulted in a deteriorating work environment, which is unpleasant, unhealthy, and often threatening.

In September 2003, I advised Ms. Yates of the availability of CTA's Employee Assistance Program (EAP) and suggested that she contact the EAP for assistance. I also referred her to CTA's medical unit in September 2003.

Based on this information, I recommended a special medical assessment for Ms. Yates.

6423 (03/87)

*EXHIBIT D*



November 25, 2003

TO: Francine Yates

FROM: Paul F. Fish, Vice President, Capital Investment

RE: Medical Referral

Due to ongoing concerns with your office demeanor and behavior, I am recommending that you seek medical attention before returning to work. I am removing you from service effective immediately until Monday December 1, 2003.

Before returning to work on that date, please call Sedgwick, CMS and consult with your doctor. When you return to work, please provide documentation that you have seen your doctor.

EXHIBIT E



# Chicago Transit Authority

Merchandise Mart Plaza, P.O. Box 3555
Chicago, Illinois 60654
(312) 664-7200

May 27, 2004

**Administrative Separation**

Ms. Francine Yates
15439 S. Dorchester – Unit 1-F
Dolton, IL 60419

**Badge #: 41648**

## CERTIFIED MAIL – RETURN RECEIPT REQUESTED
## PRIORITY MAIL SERVICE

Dear Ms. Yates:

Due to illness, you have been unable to perform you duties as Financial Analyst III since November 26, 2003. Your request for Family Medical Leave was denied because you exhausted your FMLA entitlement. In addition, your Short-term Disability benefit has expired per the parameters of Administrative Procedure # 131.

CTA President Frank Kruesi determined that exempt employees would no longer be placed in Area 605. Therefore, I have no recourse but to administratively separate you from your employment with the Chicago Transit Authority. Your separation is effective immediately. Your health insurance may continue under the Consolidated Omnibus Budget Reconciliation Act (COBRA) of 1985. You will be eligible for continuation of coverage by paying an administrative fee for this coverage. You can contact the COBRA administrator Unicare COBRA Billing at (800) 331-8492 for additional information. In addition, you are eligible for one (1) vacation day.

In regards to any pension benefits, which may be available to you, contact Ms. Gloria Cage at the Retirement Plan office for further information. She can be reached at (312) 463-0358. Finally, you can call Paul F. Fish at (312) 664-7200, extension 4590 to make arrangements to return your I.D., security pass and office key, and to obtain your personal effects.

Sincerely,

Paul F. Fish
Vice President
Capital Investment

cc:    Joyce Coleman, Human Resources/Vice President
       Jonathan Johnson, Payroll/ Manager
       Carla Jones, Benefits Services/ Benefits Coordinator
       Employee's Personnel File

EXHIBIT 78

DEA # AM8456471



KUMAR MOOLAVIL, M.D.
15475 SOUTH PARK AVENUE
SUITE 102
SOUTH HOLLAND, IL 60473
708-596-2211

NAME _Francine Yates_

ADDRESS _____ 5/24/04

EX HIBIT G4

medical supervision and monitoring should continue until the patient recovers.

Charcoal: In the event of an overdose of ABILIFY, an early charcoal administration may be useful in partially preventing the absorption of aripiprazole. Administration of 50 g of activated charcoal, one hour after a single 15 mg oral dose of aripiprazole, decreased the mean AUC and Cmax of aripiprazole by 50%.

Hemodialysis: Although there is no information on the effect of hemodialysis in treating an overdose with aripiprazole, hemodialysis is unlikely to be useful in overdose management since aripiprazole is highly bound to plasma proteins.

## CONTRAINDICATIONS

Known hypersensitivity reaction to ABILIFY. Reactions have ranged from pruritus/urticaria to anaphylaxis [see ADVERSE REACTIONS].

Brand Name: Abilify
Generic Name: Aripiprazole

Next: Abilify - Clinical Pharmacology »
« Previous: Abilify - Warnings & Precautions

« previous    1    2    3    4    5    6    7    next »

### Report Problems to the Food and Drug Administration

You are encouraged to report negative side effects of prescription drugs to the FDA. Visit www.FDA.gov/medwatch or call 1-800-FDA-1088.

Bookmark this page:  SHARE

Privacy Policy

Emotional Wellness
Get tips on therapy and treatment.

Enter email address    SUBMIT

**Health Solutions** from our sponsors

| | | | |
|---|---|---|---|
| After Breast Cancer | Better Eating | Cholesterol Roadmap | Joint Stiffness? |
| Allergic Asthma Info | Brain Health | Depression Med for You? | Know Your Om |
| Alzheimer's Questions? | Caring for Memory Loss | Early Breast Cancer? | Lower Choleste |

RxList Home | Drugs & Medications A-Z List | Picture Slideshows | Pill Identification Tool | Diseases & Conditions | Drug Me
About RxList | Contact RxList | Terms & Conditions | Privacy Policy | Sponsor Policy | Site Map
WebMD® | MedScape® | eMedicineHealth® | MedicineNet®

Copyright © 2008 by RxList Inc.
RxList does not provide medical advice, diagnosis or treatment. See additional information.

*EXHIBIT H*

**Abilify Secret Revealed**
Learn Why Most Successful Artists
Inventors & Leaders Have Bipolar
www.DaVinciMethod.com/Abilify

**Side Effects for This Med**
Comprehensive info on all side
effects and how to cope with
them.
www.healthyplace.com/lexapro

**Sleep Aids Facts**
Over-The-Counter Remedies May
Not Be Enough: Learn About An
Option
www.SleepMedication.Info

| Home | Drugs A-Z | Pill Identifier | Picture Slideshows |

**Find a Drug**

SEARCH    Advanced Search

**Abilify**

Drug Description
Indications & Dosage
Side Effects & Drug Interactions
Warnings & Precautions
Overdosage & Contraindications
Clinical Pharmacology
Patient Information

**Health Resources**

Schizophrenia
Schizoaffective Disorder



ADVERTISEMENT

**Better Than BOTOX?**
Hydroderm™ no pain

**Try it FREE!**

ADVERTISEMENT

**Drug News**

✔ 2008 Election & Health Care on WebMD. Get Informed.
Topamax May Up Risk of Birth Defects
Cholesterol Drug Vytorin Disappoints

Professional    Consumer

« previous  1  2  3  4  5  6  7  next »

## Abilify

Side Effects & Drug Interactions

FONT SIZE  A A A

### SIDE EFFECTS

**Overall Adverse Reactions Profile**

The following are discussed in more detail in other sections of the labeling:

- Use in Elderly Patients with Dementia-Related Psychosis [see BOXED WARNING and WARNINGS AND PRECAUTIONS]
- Clinical Worsening of Depression and Suicide Risk [see BOXED WARNING and WARNINGS AND PRECAUTIONS]
- Neuroleptic Malignant Syndrome (NMS) [see WARNINGS AND PRECAUTIONS]
- Tardive Dyskinesia [see WARNINGS AND PRECAUTIONS]
- Hyperglycemia and Diabetes Mellitus [see WARNINGS AND PRECAUTIONS]
- Orthostatic Hypotension [see WARNINGS AND PRECAUTIONS]
- Seizures/Convulsions [see WARNINGS AND PRECAUTIONS]
- Potential for Cognitive and Motor Impairment [see WARNINGS AND PRECAUTIONS]
- Body Temperature Regulation [see WARNINGS AND PRECAUTIONS]
- Suicide [see WARNINGS AND PRECAUTIONS]
- Dysphagia [see WARNINGS AND PRECAUTIONS]
- Use in Patients with Concomitant Illness [see WARNINGS AND PRECAUTIONS]

The most common adverse reactions in adult patients in clinical trials ( ≥ 10%) were nausea, vomiting, constipation, headache, dizziness, akathisia, anxiety, insomnia, and restlessness.

The most common adverse reactions in the pediatric clinical trials ( ≥ 10%) were somnolence, extrapyramidal disorder, headache, and nausea.

Aripiprazole has been evaluated for safety in 13,543 adult patients who participated in multiple-dose, clinical trials in Schizophrenia, Bipolar Disorder, Major Depressive

EXHIBIT I